**State v. Levine**
**Case No. 56203**
**Cuyahoga County, (8th)**
**Decided January 25, 1990**
[Cite as 1 AOA 252]

*For Plaintiff-Appellee:*
*Henry Hilow, Assistant Prosecuting Attorney, Justice Center 1200 Ontario Street, Cleveland, Ohio 44113. Timothy J. Mangan, Assistant Attorney General, State Office Tower 26th Floor, 30 East Broad Street, Columbus, Ohio 43266-0419. Robert J. Marek, 6175 SOM Center Road, 200, Solon, Ohio 44139,*

*For Defendant-Appellant:*
*Franklin J. Hickman, ESQ., Stege, Delbaum & Hickman Co., L.P.A., Standard Building, Suite 1620, 1370 Ontario Street, Cleveland, Ohio 44113-1701.*

J.F. CORRIGAN, J.

The defendant[1] appeals from the trial court's judgment ordering the defendant's continued commitment of a maximum security mental health facility. On September 26, 1979 the trial court found the defendant not guilty by reason of insanity of the aggravated murder of an elderly man, the attempted aggravated murder of the man's wife, and associated kidnapping, aggravated burglary, and extortion charges. The trial court, in 1980 and 1983, denied the defendant's requests for release made pursuant to R.C. 2945.40. This court affirmed the trial court's latter order of continued commitment. See *State* v. *Levine* (Nov. 5, 1984), Cuyahoga App. No. 47976, unreported. This appeal arises from the proceedings on continued commitment held in July of 1988.

The defendant, in two assignments of error, argues that (1) clear and convincing evidence does not support the trial court's judgment, and (2) Ohio's statutory scheme for the commitment of those found not guilty by reason of insanity is unconstitutional as applied to him. These claims lack merit so we affirm the trial court's commitment order.

I.

At the hearing on recommitment, the state argued that the defendant was "mentally ill" as defined under R.C. 5122.01(A) and that by virtue of his illness posed a danger to others thus requiring his hospitalization as provided under R.C. 5122.01(B)(2). The defendant claimed that he had exhibited no symptoms of mental illness for seven years and that he was effectively free of any mental illness which would permit the state to continue his psychological commitment. Since our review requires a consideration of the totality of the circumstances in this case, we feel compelled to thoroughly recount the evidence adduced at the commitment hearing. Cf. *In re Burton* (1984), 11 Ohio St. 3d 147, paragraph one of the syllabus.

The state introduced the testimony of the decedent's widow who survived the defendant's attack and the deposition testimony of the defendant's former wife. The decedent's widow testified in regard to the nature of the offense which resulted in the defendant being found insane. The defendant's wife testified concerning the defendant's behavior during their marriage.

The decedent's widow testified that on May 2, 1979 at approximately 7:30 a.m., the defendant and another man came to the couple's apartment claiming to be police officers. Upon entering the apartment, the two men drew guns and the defendant in a "cold" and controlled manner, ordered the decedent to telephone his stock broker to sell the decedent's stock for a certain amount of cash. However, the decedent explained that he could not readily obtain cash for such a stock transaction. Thereupon the defendant and his accomplice conducted the couple to an automobile and drove them to a local motel. There the decedent pleaded for the couple's lives and promised to raise enough money to satisfy the defendant's demands. However, the defendant expressed dissatisfaction with the amount of these offers.

The defendant and his accomplice then escorted the two to the automobile and drove aimlessly through the neighborhood. At one point, they stopped in order to permit the decedent to call his banker from a public telephone. However, the decedent failed in his attempt to contact his banker and he returned to the automobile. After driving for a short while the decedent said "something" to the defendant and the defendant turned around and shot the decedent to death and then shot the decedent's wife.

The defendant's wife testified that she has known the defendant since the two dated in high school in the early 1960's. She testified that during the time that they dated until their marriage in 1968, the defendant would periodically have sudden violent outbursts

during which he would beat her. On one occasion the defendant broke her nose. The witness testified that periods of calm followed the defendant's violent outbursts.

The witness testified that the defendant exhibited no violent behavior during the first six years of their marriage. However, in 1974, the defendant was hospitalized for one week in order to treat depression. Thereafter the defendant came under the regular care of a psychiatrist, Dr. Pezso Levendula. While under the doctor's treatment, the defendant again experienced outbursts of violent behavior followed by periods of calm. The defendant's former spouse testified that the defendant vented accumulated personal and business stress in violent outbursts against others. She stated that in 1978 during a domestic quarrel, the dependant pulled a phone out of a wall, punched a hole through a closet door, threw household items against the walls of their home, and smashed pictures and mirrors throughout the house. The defendant further grabbed his wife's eyeglasses from her face and shot holes in the wife's automobile with a gun. The witness testified that the defendant was under Dr. Levendula's care at the time of the murder.

The defendant's wife further testified that the defendant skillfully manipulated people. She stated that shortly after the trial court committed the defendant after finding him not guilty by reason of insanity, the defendant told her that he would be free from incarceration in three months "because he knew what he was doing." The witness said that during 1979 and 1980 she received threatening letters and telephone calls from the defendant. These threats discontinued after she notified the local media. During this period the defendant also made grandiose promises to the couple's three children. She stated that she has had no contact with the defendant since that time.

The defense introduced as evidence fourteen reports of mental health professionals who did not testify at the hearing but who had treated or examined the defendant at various times since 1966. These reports provide a comprehensive mental history of the defendant.

In 1966 the defendant obtained a release from jail, where he had apparently been incarcerated on a forgery charge, in order to admit himself at a local hospital for treatment of depression. He remained hospitalized for thirty-four days. His treating physician entered the following diagnosis of the defendant upon his release: "Schizophrenic reaction, schizo

affective type, associated with depression, severe, improved."

In 1974, the defendant again sought treatment for depression and remained hospitalized for twenty-eight days. The defendant admitted that he had an "urge to kill someone" and described himself as a "walking bomb". At this time the treating physician diagnosed him as being a manic depressive with "unipolar depression" and an "explosive personality".

Dr. Levendula, in a report prepared for the defendant's counsel, in 1979 stated that he had treated the defendant since 1973. The defendant first came to him complaining of depression. During the next six years the doctor saw the defendant on a regular basis two to eight times a month. The defendant revealed to the doctor homicidal and suicidal urges. The defendant's voluntary hospitalization in 1974 came as a result of the doctor's recommendation. The doctor stated that the defendant's homicidal and suicidal tendencies appeared to have abated at this time through psychotherapy and anti-psychotic medication.

In late 1978 and early 1979 the defendant, apparently reacting to the stress of maintaining his private business and the threat of separation from his wife, exhibited increasingly violent tendencies.

On April 21, 1979, the doctor went to the defendant's house at the request of his wife who claimed that the defendant was in a violent rage and threatened her safety and the safety of the couple's children. Upon his arrival, the defendant appeared calm and denied his violent behavior. Three days later the defendant met the doctor at his office. The doctor stated in his report that the defendant appeared composed at that time. Seven days after this final meeting with the doctor, the defendant murdered the victim.

The doctor refrained from pronouncing diagnosis of the defendant in his report. He merely stated his opinion that at the time of the crime the defendant had a defect of the mind that so impaired his reason that he did not appreciate the wrongfulness of his acts and could not refrain from committing them.

A defense psychiatrist, Dr. Emanuel Taney, filed a report in 1979 in support of the defendant's claim that he was legally insane at the time of the crime. The psychiatrist based his report upon an interview with the defendant, reports from other doctors on the issue of insanity, and the defendant's medical

records. He diagnosed the defendant as having "a psychotic illness" which precluded his ability to refrain from committing the criminal acts and which precluded his ability to appreciate the wrongfulness of his acts.

The defendant also submitted as evidence the evaluations of two court psychiatrists and one court psychologist ordered and received by the trial court in conjunction with the sanity determination in 1979. See R.C. 2945.39.

Dr. Phillip J. Resnick of the county court of common pleas psychiatric clinic examined the defendant for approximately five hours over the course of four separate meetings in June and July of 1979. In relation to the actual crime, the defendant told him that "all the frustration went out of me with those bullets." The defendant claimed that he had never felt such peace of mind. He felt no compassion or remorse for the victim. The doctor diagnosed the defendant as having "schizo-affective schizophrenia" and an "explosive personality". He described the defendant at the time of his evaluation as being "not actively psychotic." The doctor, in his evaluation of the defendant's mental status, stated that the defendant had both suicidal and homicidal potential for the future.

A second court psychiatrist, Dr. Stuart Younger, examined the defendant for one hour on August 29, 1979 and for fifteen minutes on September 5. This doctor too based his report both upon his interviews with the defendant and records filed with the trial court. He diagnosed the defendant as having a "major" psychiatric illness which could variously be labeled "manic depressive illness", "psychotic depression", "paranoid schizophrenia" or "schizo-affective schizophrenia". He described the defendant as having a "[p]ersonality disorder characterized by impulsiveness, outbursts of violence, amorality, and disregard for the feelings of others." The doctor stated:

"Although I saw no evidence of psychotic mental illness in my clinical interviews with the defendant, the history of psychosis in the two hospitalizations and on the psychological testing * * * is impressive. My opinion from reading the various reports and my interview with the dependant is that the severity of the illness waxes and wanes and at times the defendant is in remission by which I mean there is no evidence of psychotic mental illness."

Both court psychiatrists concluded that the defendant was legally sane at the time of the attacks.

A clinical psychologist, Dr. Stanley Althoff, administered various psychological tests to the defendant in June of 1979. He determined that the defendant had "average" intelligence. His initial clinical impression of the defendant was of a "mildly depressed, impulsive, generally intact fellow." However, he stated tests revealed the defendant as being "prone to episodic and violent affect storms where he likely explosively [sic] releases stored up primitive aggression." He found the defendant to be "moderately manipulative" of others. The doctor concluded:

"The outstanding feature of [the defendant's] psychological testing is his preoccupation with violence and destruction. * * *. The results of the psychological [testing] suggests a diagnosis of schizophrenia, schizo-affective type, (depression), with strong paranoid features."

Two status reports written in 1980 by Dr. Lewis Lindner, the clinical director at Lima State Hospital where the trial court first committed the defendant, show that the defendant continued to suffer from severe mental impairment. The report filed by the doctor in July of 1980 reveals the defendant to have been "superficially cooperative", concealing considerable anger and hostility. The defendant appeared preoccupied with vengeance against those perceived to have wronged him. He manifested no remorse for his actions. He diagnosed the defendant as being a paranoid schizophrenic with a narcissistic and paranoid personality.

The doctor's report of the panel review conducted by staff members for the defendant in October of 1980 shows the defendant to have been "extremely obsessed" with his legal situation. The panel concluded that the defendant still suffered from mental illness which posed a danger to others. However, based upon the fact he had not exhibited recent violent behavior, the panel recommended his transfer to a civil mental hospital.

In response to this panel recommendation, the trial court requested a review by a court psychiatrist, Frank Miller. The doctor, in his report dated November 6, 1980, stated that the defendant continued to exhibit no remorse for his acts. He noted from the defendant's

secretive conduct with Dr. Levendula that the defendant "is capable of great deception." He diagnosed the defendant as having partially remitted "paranoid schizophrenia" and concluded that the defendant remained dangerous and accordingly required continued commitment in a maximum security facility.

In 1983, a panel consisting of Department of Mental Health psychiatrists: Magdi Rizk, John Davis, and John Vermeulen, reviewed the defendant's mental status and submitted their report to the trial court. They based their report, filed March 17, 1983, upon a two-hour interview of the defendant, interviews with facility staff members, and a review of the records in the case.

The panel found that the defendant had been generally cooperative with staff members. Since the time of his admission to the hospital on October 5, 1979, the defendant had failed to exhibit violent or suicidal behavior or symptoms of psychosis. His doctors discontinued prescribing anti-psychotic medication in May of 1981. At the time of the review, the defendant occasionally received small dosages of anti-depressant medication in order to treat mild depression.

Before the panel, the defendant stated in explaining the crime: "A senseless act of violence, it is hard for me to believe that I took a human life * * *." The consensus of staff members was that his mental illness was in complete remission. They reported that except for one time when the defendant made verbal threats against the trial judge, he had not exhibited physically aggressive or threatening behavior.

The panel diagnosed the defendant as having a "Major affective disorder, [b]ipolar depressed in full remission" and a narcissistic personality disorder. They concluded that at that time the defendant was not suffering from a mental illness as defined under state law. However, the panel reported that the defendant would always require treatment to combat depression or psychosis to which he is predisposed. The panel recommended his transfer to a less restrictive facility.

Dr. Tito Alquizola, staff psychiatrist at the Dayton Mental Health center where the defendant was transferred to on May 17, 1983, filed a status report concerning the defendant on January 14, 1985. Based upon his review of the defendant's records and an hour-long interview of the defendant, the doctor reported that the defendant had exhibited no symptoms of an affective disorder since his admission to the facility. The doctor stated:

"It is possible that such symptomatologies as had been observed before the offense are psychiatric facets which [the defendant] shows when under severe pressure such as is inevitable in the less structured outside world. *** [I]t is quite possible that the absence of very real pressures, such as maintaining domestic and other relationships, responding to business pressures, that freedom from such stress are enough to prevent the recurrence of his previous symptoms."

The doctor concluded that the defendant had no thought or affective disorder which required treatment of any kind. However, he recommended continued psychotherapy in order to monitor the possible recurrence of symptoms of his previous mental disorders.

The Department of Mental Health formed a panel of two staff psychiatrists, Dr. Jaseem Pasha and Dr. Joseph Trevino, and one consulting psychologist, Dr. Thomas Martin, to address Dr. Alquizola's recommendation that the defendant be discharged from the Dayton Mental health Center. The panel concluded that the defendant suffered from no mental illness or personality disorder, nor represented a substantial risk of physical harm to himself or others. The panel refused to speculate concerning his future potential for violent behavior, merely noting that those with a prior history of violent behavior have a greater propensity for violence in the future than those without a history of violence. The panel accordingly recommended the discharge of the defendant.

The same panel evaluated the defendant at the end of 1985. In a report dated November 12, 1985, the panel reaffirmed its earlier conclusions, stating: "[The defendant's] period of 'insanity' was of brief duration and extremely self-limited, and clinically resolved itself completely without the aid of any anti-psychotic medications." Once again, the panel concluded that the defendant was not subject to hospitalization.

At the hearing on recommitment, the state called as its only expert witness Dr. Magdi S. Rizk, a court psychiatrist. The state further called, as if on cross-examination, Dr. John Davis, the Medical Director for the Ohio Department of Mental Health.

The defendant called as its expert witnesses Dr. Pasha, the defendant's treating psychiatrist at the Dayton Mental Health Center, Dr. William McIntosh, psychology director at the center, and two experts in forensic psychiatry, Dr. Paul Appelbaum and Dr. Kurt Bertschinger.

Dr. Rizk testified that he examined the defendant once in 1979, once in 1982, once in 1985, once in 1987, and once in 1988. He initially examined the defendant in connection with his eligibility for civil commitment after his being found not guilty by reason of insanity. The doctor testified that from his examination of the defendant and the defendant's records, he diagnosed the defendant as having "major affective disorder, bipolar, depressed, in full remission." He further concluded that the defendant suffered from narcissistic personality disorder.

The doctor explained that the term "major affective disorder" meant that the individual suffered from severe mood swings. The illness is characterized by swings of mood between severe suicidal depression to reckless euphoria. The witness defined the term "bipolar depressed" as describing an individual with a past history of manic attacks.

The doctor testified that an individual who has a specific mental illness in remission either exhibits no symptoms of the illness or exhibits only mild symptoms. He stated that one cannot predict when a person in remission may suffer a relapse.

The witness testified that the defendant's history indicated that stress triggered the defendant's bouts of severe depression. He opined that the Dayton Mental Health Center's structured atmosphere involved less stress than normal daily life. He stated that the defendant's exposure to these outside pressures could possibly result in a relapse of his condition. However, he stated that the defendant currently shows no sign of a substantial disorder of thought, mood, perception, orientation, or memory.

The witness testified that during his interviews the defendant expressed remorse for his actions. Because the defendant had exhibited no violent behavior or symptoms of mental illness without medication since 1981, and because he had cooperated with the facility's staff in his treatment, the doctor recommended that the defendant be granted his conditional release. The conditional release as recommended by the witness, would involve continued biweekly contact with a mental health professional and notice to the trial court within twenty-four hours of the defendant's failure to attend one of those sessions.

Doctor Davis testified that he examined the defendant once in 1982 as part of a panel review and once in 1988. He testified that his 1988 examination of the defendant lasted from one to two hours. The doctor denied advising the defendant concerning strategy to obtain his release. However, he admitted telling the defendant, "when you approach [the trial judge], you have to approach it like a poker game; aim high but be willing to settle in the middle ground." He further admitted discussing with the defendant the alternative of seeking conditional release as opposed to unconditional release. He denied being predisposed toward obtaining the release of the defendant.

The witness testified that the defendant currently has no mental illness. He admitted diagnosing the defendant in 1982 as having an affective disorder, bipolar depressed, in remission with a narcissistic personality disorder. However, he hypothesized that that initial diagnosis may have been incorrect since the defendant had had no psychotic episodes for six years even though his medication had been discontinued.

The doctor recommended that the defendant be conditionally released to a civil hospital where he would remain for 30 days undergoing observation. Thereafter, he recommended that the defendant be released into society.

Dr. Pasha, in testifying on behalf of the defendant, stated that he had been the defendant's treating psychiatrist at the Dayton Mental Health Center since July of 1986. He further testified that prior to that time he participated in a panel review of the defendant's mental status in November of 1985 and personally examined him once in January of 1985. The witness said that as his treating psychiatrist, he sees the defendant generally once a week.

The doctor testified that since 1986 the defendant has been assigned to the least restrictive ward in the facility and has been afforded maximum privileges. The doctor has not observed any symptoms of mental illness in the patient, and accordingly, the defendant does not have a specific treatment plan.

The witness testified that since his admission to the center there is no documented instance where the defendant exhibited behavior which would have placed another in fear of harm. He further testified that he

personally has not observed such behavior. He concluded that the defendant does not represent a threat of imminent danger to himself or others.

The doctor related several instances where the defendant reacted to what the doctor described as "stressful" situations in a normal manner. In the summer of 1987, the facility temporarily transferred the defendant from the least restrictive ward to the center's maximum security ward to discipline him for the possession of certain banned personal articles. The facility transferred him back to the maximum privilege ward after a week. He was again transferred to the maximum security ward shortly thereafter for three and a half months for an undisclosed reason. In 1988, the state transferred the defendant to the county jail in Cleveland in order for him to undergo examinations conducted by a court psychiatrist. Due to an administrative error, the defendant remained at the jail during the weekend rather than being immediately transferred back to the Dayton Mental Health Center.

In each of these instances, the defendant complained bitterly to authorities, but exhibited no violent behavior. The defendant further made vague threats that "someone would pay" for these actions. Dr. Pasha testified that the defendant's response to each of these inconveniences fell within the range of normal behavior. He interpreted the defendant's threats as being threats of administrative and legal actions rather than being threats of physical harm to any one individual.

The witness admitted that the defendant had previously been diagnosed in 1966 as "schizophrenic reaction, schizo affective type." He stated that such a diagnosis indicated a chronic mental illness which has no known cure.

The doctor, in conclusion, stated that the defendant did not have a mental illness as defined by statute. He recommended a release of the defendant with court ordered follow-up psychiatric and psychological monitoring. The doctor recognized that the defendant had some emotional stress problems that did not amount to a mental illness. However, he opined that the defendant would adjust "pretty well" to outside stresses because he had developed effective coping strategies during his commitment. The doctor stated that the defendant had a "fair to good" chance of never being involved with the law again. He did not believe that the defendant could have concealed a mental illness from him or other staff members during his stay at the mental health center.

Dr. William McIntosh testified that he had been the psychology supervisor at the Dayton Mental health Center since March of 1980 and the psychologist assigned to the defendant's ward since February of 1985. He stated that he has conducted formal psychological examinations of the defendant in 1983, November of 1985, June of 1986, May of 1987, December of 1987 and April of 1988. The doctor testified that he sees the defendant either casually or formally on a daily basis. He estimated his total amount of personal contact with the defendant as exceeding one thousand hours.

The witness described the defendant as being non-aggressive and well-behaved. He opined that the defendant expresses his anger and frustration in a normal manner.

He testified that the defendant was twice transferred from the privileged unit at the center to the most restrictive ward. The first transfer resulted from the discovery by staff members that the defendant possessed a cigarette lighter, a nail clipper, and vitamin supplements in violation of the facility's regulations. The second transfer occurred for a reason undisclosed to him by the facility's administration.

However, the doctor claimed the administrators did not transfer him for a clinical reason nor did he observe or discover recorded instances of violent misbehavior. Dr. McIntosh testified that these transfers extremely upset the defendant because he considered them unjust. However, the defendant's reactions to those transfers fell within the limits of normal behavior. His threats that "someone would pay" constituted more of a general expression of anger and frustration as opposed to a real threat of harm to another.

Dr. McIntosh testified that during the defendant's commitment at the center the doctor observed no sign that the defendant had a substantial disorder of thought, mood, perception, orientation, or memory. Repeated psychological tests conducted on the defendant revealed no sign of mental illness. The witness stated that the validity components of these psychological tests indicated that the defendant took the tests in a "reasonably open" and "forthright" manner.

The doctor testified that during his

commitment at the center there have been no instances of direct physical aggression involving the defendant. The doctor has observed no characteristics of dangerous behavior in the defendant and concluded, based upon both his current and past behavior, that the defendant poses no current threat of danger to anyone. The doctor recommended the conditional release of the defendant with court-ordered monitoring by a mental health professional.

The witness agreed that various mental health professionals had previously diagnosed the defendant as having various chronic, incurable mental illnesses. However, he concluded from his examinations and the review of the defendant's medical history that those diagnoses were incorrect according to current standards.

The witness agreed that the defendant would experience substantially different stresses in the outside world than the stresses he faces within the mental health facility.

Dr. Appelbaum testified that he reviewed the defendant's entire treatment record and examined the defendant in May of 1988 for approximately four hours. The doctor stated that he found no evidence that the defendant suffered from a substantial disorder of thought, mood, perception orientation, or memory.

In determining whether the defendant posed a danger to others, the doctor first noted that the defendant had exhibited no violent behavior since 1982. He deemed the circumstances of the defendant's commitment to be highly stressful and further considered as exacerbating this stressful situation the defendant's failures to obtain his release. He found the absence of violent outbursts during his commitment to be even a more compelling factor in light of the stressful circumstances. In addition, the witness took into account the defendant's apparent lack of vengeful motives and the current absence of the symptoms of mental disorder evident at the time of the crime. Based upon his consideration of these factors the doctor opined that the defendant represents a low risk of danger to others during a period of several months following his release. The doctor stated that he could not make a prediction based upon reasonable medical certainty beyond that period because he could not predict the environmental factors that could impact the defendant. He offered that continued professional outpatient monitoring of the defendant would be required after his release in order to assess the defendant's

reaction to stresses encountered in the outside world.

The doctor testified that during his interview the defendant expressed remorse concerning the crime and the harm caused to the victims' family and his own family.

Dr. Bertschinger testified that he examined the defendant in March of 1988 for approximately two hours at the behest of the Department of Mental Health. He further spent two and one-half hours reviewing the defendant's clinical records.

The doctor testified that based upon the interview and the defendant's records the defendant suffered from no mental illness. He doubted that the defendant has been able to conceal a mental illness since the records of the Dayton Mental Health Center disclosed that the defendant has exhibit no symptoms of mental illness since his admission. The witness further stated that he was satisfied that the defendant posed no threat to others. Dr. Bertschinger based his opinion upon the fact that the defendant had exhibited no violent behavior since his commitment at the mental health center in 1982. The doctor recommended the conditional release of the defendant which would include a transitional two-month commitment at a civil mental hospital followed by indefinite outpatient monitoring.

The trial court, upon considering this evidence, determined that the defendant was mentally ill as defined by R.C. 5122.01(A) and subject to hospitalization pursuant to R.C. 5122.01(B)(2). Accordingly, the trial court ordered his recommitment to the Dayton Mental Health Center.

## I.

The defendant, in his first assignment of error, argues that clear and convincing evidence does not support the trial court's recommitment order.

A trial court may order the continued commitment of an individual where clear and convincing evidence establishes that that individual is a mentally ill person subject to court-ordered hospitalization. See R.C. 2945.40(C); R.C. 5122.15(C).

> "'Mental illness' means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

R.C. 5122.01(A). R.C. 5122.01(B) provides in relevant part:

"'Mentally ill person subject to hospitalization by court order' means a mentally ill person who, because of his illness:

"* * *

"(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

"* * *."

In making the determination of whether a person is subject to hospitalization under R.C. 5122.01(B), the trial court must consider the "totality of the circumstances." Cf. *In re Burton* (1984), 11 Ohio St. 3d 147, paragraph one of the syllabus (commitment upon determination that defendant incompetent to stand trial).

"Factors which are to be considered by the court in a commitment hearing include, but are not limited to, the following: (1) whether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the law, rules, regulations and values of society; * * *." *Id.*, at 149-150. A trial court must evaluate a person's present mental state in light of his current behavior, recent behavior, and his past dangerous propensities. *Id.*, at 149.

While the trial court must consider the expert medical testimony in determining whether continued hospitalization shall be ordered, the question of release is ultimately one of law. Cf. *DeVeau* v. *United States* (D.C. App. 1984), 483 A.2d 307, 312 (construing analogous District of Columbia code section).

Accordingly, the trial court is not required to accept the consensus of medical opinion concerning the issues of whether an individual has a mental illness or whether an individual poses a danger to society. Cf. *id.*

The trial court has broad discretion in making the determination as to whether commitment shall be continued. Cf. *id.*, at 149-150. Accordingly, this court shall not reverse the trial court's commitment order absent an affirmative showing that the trial court acted unconscionably, arbitrarily, or unreasonably. Cf. *id.*

We find that the trial court properly exercised its discretion in ordering the defendant's continued commitment. Substantial evidence establishes that the defendant suffers from a mental illness as defined under R.C. 5122.01(A). Dr. Rizk diagnosed the defendant as having a "major affective disorder, bipolar, depressed". Nine other mental health professionals have at various times diagnosed the defendant as having similar mental disorders. Both the state's expert witness and the defendant's expert witnesses testified that these diagnoses represent substantial mental disorders which are chronic in nature and incurable.

We recognize the Dr. Rizk testified that the defendant's mental illness is in "full remission". An individual whose mental illness is in a state of remission is subject to continued commitment pursuant to R.C. 5122.01(B) if there is a "substantial likelihood" that the individual's release will result in physical harm to others. *In re Burton, supra*, at 150. This determination shall be made on a case by case basis. Cf. *State* v. *Levine, supra.*

The circumstances in this case warrant the defendant's continued commitment. In determining whether a person who has a mental illness in a state of remission poses a danger to society the trial court must consider (1) the cause of the remission, and (2) the probability that the individual will continue treatment to maintain the remissive state of his illness upon his release. Cf. *id.*

Three factors predominate in explaining the defendant's "remission". First, the defendant's modification of his threatening behavior coincided with his appreciation of the legal consequences of his conduct. The evidence discloses that the prospects for release highly motivate him to conform his conduct to social norms.

Secondly, the defendant currently lives in

a highly structured environment. While we are cognizant that the defendant does not exist in a stress-free vacuum, the stresses the defendant currently must deal with differ in kind and in degree with the stresses encountered in the outside world. The evidence substantiates the fact that the build-up of stress triggers the defendant's violent behavior. Accordingly, the defendant's current release would involve the substantial risk that any future personal or business failure would cause the defendant to react violently.

The third factor to be considered in explaining the fact that the defendant currently fails to exhibit symptoms of mental illness is the periodic nature of his disorder. The defendant's history prior to the offense discloses that the defendant has had periods for as long as eight years during which he has functioned at a very high level. Approximately eight years have passed since the last time the defendant exhibited violent tendencies. Given the likelihood that (1) the fact that the defendant is currently motivated to obtain his release, and (2) the fact that he currently resides in a relatively stress-free environment are circumstances which serve to inhibit the frequency of his periodic violent outbursts, release at the current time would be premature.

In evaluating the probability that the defendant would continue treatment upon his release, three factors impress this panel. First, the paucity of evidence that the defendant feels remorse and/or sorrow with regard to the attack on the victims or that the defendant fully appreciates his condition. At the hearing the defendant represents through counsel that he has no mental illness. Thus, it is problematical that upon his release the defendant would seek help in ensuring the continued remission of his illness.

Moreover, the defendant appears to lack fundamental insight into why he committed the offense. The record does not reveal that the defendant believes that his acts of violence resulted from a mental illness. To the contrary, the record reveals that the defendant may feel that he acted for non-pathological reasons. Throughout his interviews with mental health professionals the defendant has characterized the plan which resulted in the killing as a "money-making scheme". The defendant in one letter to his wife indicated that the crime "was an act of rebellion against society, and its lies and false beliefs."[2]

Nowhere in the record does it indicate that any of the mental health professionals ascertained what Mr. Levine meant by that revealing statement. A reasonable interpretation of the statement is that somehow the brutal kidnapping, wounding and murder were justified and were motivated by a sincere desire to protest the "lies and false beliefs" of society.

In concluding that the trial court properly ordered the defendant's recommitment, we are also mindful of the nature of the offense which resulted in the defendant's hospitalization in a maximum security mental health facility. Ten years ago, the defendant brutally slew an elderly man and severely wounded his wife. This circumstance, in conjunction with the circumstances discussed above, requires the trial court to act with deliberate caution prior to permitting the defendant to reenter society. For these reasons we also conclude that pursuant to R.C. 5122.15(E), the decision of the trial court that the Dayton Mental Health Facility constitutes the least restrictive setting for appellant's commitment is justified since that determination is consistent with both his treatment needs and public safety concerns. *State* v. *Johnson* (1987), 32 Ohio St. 3d 109.

Accordingly, we overrule the defendant's first assignment of error and affirm the trial court's commitment order.

### III.

The defendant, in his second assignment of error, raises various claims challenging the constitutionality of Ohio's statutory commitment scheme as applied in this case. Our review of the record discloses that the defendant has waived these claims since he failed to raise them with the trial court. See *State* v. *1981 Dodge Ram Van* (1988), 36 Ohio St. 3d 168, 170. Furthermore, this court in substance addressed and overruled these claims in the defendant's prior appeal. See *State* v. *Levine, supra*, slip opinion at 7-9.

Accordingly, we overrule the defendant's second assignment of error and affirm his recommitment to the Dayton Mental Health Center.

### *JUDGMENT AFFIRMED.*

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue

out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

Judge Thomas J. Parrino, Retired of the Eighth District of Appeals, sitting by assignment.

SWEENEY, P.J., and PARRINO, J., Concur.

---

[1] For the sake of clarity, the appellant is referred to as defendant herein, although he was found not guilty by reason of insanity.

[2] It should be noted in 1982 a review panel of Department of Mental Health psychiatrists reviewed Mr. Levine's status and found that since the time of his admission to the hospital on October 5, 1979 he failed of his exhibit violent or suicidal behavior or symptoms of psychosis. The letter to his wife was written on March 28, 1980.